Sara LARIOS, et al., Plaintiffs,

v.

Cathy COX, Defendant.

No. CIV.A. 1:03–CV–693–C.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 2, 2004.

Frank B. Strickland, Anne Ware Lewis, Strickland Brockington Lewis, Stacy Grant Freeman, Arnall Golden & Gregory, Atlanta, GA, E. M. Braden, phv, Amy M. Henson, phv, Baker & Hostetler, Washington, DC, for plaintiffs.

Dennis Robert Dunn, Thurbert E. Baker, Office of State Attorney General, Mark Howard Cohen, Troutman Sanders, David F. Walbert, Parks Chesin & Walbert, Atlanta, GA, for defendants.

Before MARCUS, Circuit Judge, PANNELL and O'KELLEY, District Judges.

PER CURIAM.

BY THE COURT:

In an order dated February 10, 2004, this three-judge court ruled in favor of the plaintiffs on their claim that the existing reapportionment schemes for the Georgia House of Representatives and Senate violated the one person, one vote principle firmly rooted in the Fourteenth Amendment's Equal Protection Clause. We therefore enjoined the defendant from further use of those plans in any future elections, and we gave the Georgia General Assembly until March 1, 2004, to submit to

the court enacted reapportionment plans that are acceptable to the legislature and conform to the Constitution and this court's opinion. The Georgia General Assembly having been unable to meet this deadline, it now falls to this court to draw *interim* reapportionment plans for use in the upcoming election cycle. *See Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978); *Reynolds v. Sims,* 377 U.S. 533, 585–87, 84 S.Ct. 1362, 1393–94, 12 L.Ed.2d 506 (1964).

By order dated March 1, 2004, we appointed Mr. Joseph Hatchett to serve as Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure. We now adopt the following guidelines to which the Special Master shall adhere in preparing reapportionment maps for the House of Representatives and Senate of the General Assembly of Georgia. Preparing reapportionment plans in a timely manner, while reconciling the demands of the Constitution, the Voting Rights Act, and the redistricting principles traditionally recognized by the State of Georgia, presents a substantial undertaking.

As we have noted, the reapportionment of legislative bodies is "a legislative task which the federal courts should make every effort not to pre-empt." *Wise,* 437 U.S. at 539, 98 S.Ct. at 2497. However, where a federal court has declared an existing apportionment scheme unconstitutional and the legislature, after being afforded a reasonable opportunity, fails to adopt a substitute plan, "it becomes the 'unwelcome obligation' . . . of the federal court to devise and impose a reapportionment plan pending later legislative action."[1] *Id.* at 540, 98 S.Ct. at 2497 (quot-

ing *Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977)).

In performing the reapportionment task, a court must keep in mind that court-drawn plans are held to stricter standards than are legislative plans in terms of population equality and racial fairness. *Upham v. Seamon,* 456 U.S. 37, 39, 102 S.Ct. 1518, 1520, 71 L.Ed.2d 725 (1982); *Wise,* 437 U.S. at 540, 98 S.Ct. at 2497; *Connor v. Finch,* 431 U.S. at 414, 97 S.Ct. at 1833. Moreover, the court's reapportionment "must be accomplished circumspectly, and in a manner 'free from any taint of arbitrariness or discrimination.'" *Connor v. Finch,* 431 U.S. at 415, 97 S.Ct. at 1834 (quoting *Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964)).

■ We add that because reapportionment is primarily a legislative task, even when it becomes the court's obligation to draw a redistricting plan, it must "defer to legislative judgments on reapportionment as much as possible." *Upham,* 456 U.S. at 39, 102 S.Ct. at 1520. Nonetheless, "it is forbidden to do so when the legislative plan would not meet the special standards of population equality and racial fairness that are applicable to court-ordered plans." *Id. See also Abrams v. Johnson,* 521 U.S. 74, 79, 117 S.Ct. 1925, 1930, 138 L.Ed.2d 285 (1997) ("When faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.").

---

1. We continue to encourage the enactment of reapportionment maps by the General Assembly of Georgia, which is now in session. We are aware that members have been working on and considering such legislation. Nothing in this order or any previous order of this court is intended to prevent or forestall the General Assembly and the Governor from considering and enacting reapportionment plans after March 1, 2004, resolving the issues in this case. Nor should this court's orders be construed in any way as discouraging such a resolution of this matter.

In this case, the court and its Special Master must consider three principal criteria in drafting the reapportionment plans: the Constitution, the Voting Rights Act, and the neutral principles of redistricting. Plainly, the requirements of the Constitution and the Voting Rights Act take precedence over any traditional redistricting principles. *Arizonans for Fair Representation v. Symington,* 828 F.Supp. 684, 687 (D.Ariz.1992) (three-judge panel). *See also Good v. Austin,* 800 F.Supp. 551, 554 (E.D. Mich.1992).

■ Because the constitutional wrong to be remedied in this case is a violation of the Fourteenth Amendment's one person, one vote principle, equality of population is a paramount concern in redrawing the maps. *See Colleton County Council v. McConnell,* 201 F.Supp.2d 618, 627 (D.S.C. 2002) (three-judge panel). The Equal Protection Clause requires that "the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Reynolds v. Sims,* 377 U.S. at 568, 84 S.Ct. at 1385. "[T]he overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Id.* at 579, 84 S.Ct. at 1390. In short, the strength of a citizen's vote may not depend on the fortuity of where he resides.

■ The next major priority for the court in drafting the plans is to ensure full compliance with the Voting Rights Act, 42 U.S.C. § 1973. While the preclearance requirement of Section 5 does not apply to reapportionment plans prepared and adopted by federal courts to remedy constitutional violations, *Abrams,* 521 U.S. at 95, 117 S.Ct. at 1938; *Connor v. Johnson,* 402 U.S. 690, 691–92, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971), the court should nonetheless comply with the racial-fairness mandates of § 2 of the Act, as well as the purpose-or-effect standards of § 5 of the Act. *See Abrams,* 521 U.S. at 90, 96, 117 S.Ct. at 1935, 1938; *see also Colleton,* 201 F.Supp.2d at 628 (expressing a similar rule); *Smith v. Clark,* 189 F.Supp.2d 529, 539–40 (S.D.Miss.2002) (three-judge panel) (same). Accordingly, the court and its Special Master must ensure that the plans neither *dilute* voting strength on the basis of race, color, or membership in a language minority group, *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), nor lead to *retrogression* in the position of racial minorities, *Beer v. United States,* 425 U.S. 130, 140, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976) (citation and quotation marks omitted).

■ The next set of guidelines is *secondary* to ensuring compliance with the Constitution and the Voting Rights Act. In court-adopted plans, district courts have frequently considered policies such as compactness, contiguity, minimizing the splits of counties and municipalities, recognizing communities of interest, maintaining the cores of existing districts, and using well-defined boundaries as district lines, insofar as those policies did not conflict with the primary considerations of compliance with the one person, one vote principle and the Voting Rights Act. *See, e.g., Colleton County,* 201 F.Supp.2d at 646–49; *Smith,* 189 F.Supp.2d at 540–46; *Dillard v. City of Greensboro,* 956 F.Supp. 1576, 1578 (M.D.Ala.1997). Based on our thorough review of past legislative guidelines and relevant case law, we recognize and direct the Special Master to apply Georgia's traditional redistricting principles of *compactness, contiguity, minimizing the splits of counties, municipalities, and precincts,* and *recognizing communities of interest. See Abrams,* 521 U.S. at 84, 117 S.Ct. at 1932–33 (affirming *Johnson v. Miller,* 922 F.Supp. 1556 (S.D.Ga.1995) (three-judge

court)); *see also* 1991 Guidelines; 2001 Guidelines.

We also recognize that in the process of adopting reapportionment plans, the courts are "forbidden to take into account the purely political considerations that might be appropriate for legislative bodies." *Wyche v. Madison Parish Police Jury,* 635 F.2d 1151, 1160 (5th Cir.1981).[2] Thus, "many factors, such as the protection of incumbents, that are appropriate in the legislative development of an apportionment plan have no place in a plan formulated by the courts." *Wyche v. Madison Parish Police Jury,* 769 F.2d 265, 268 (5th Cir.1985) (*per curiam* ).

█ Finally, we observe that "a court-drawn plan should prefer single-member districts over multimember districts, absent persuasive justification to the contrary." *Wise,* 437 U.S. at 540, 98 S.Ct. at 2497; *see also East Carroll Parish Sch. Bd. v. Marshall,* 424 U.S. 636, 639, 96 S.Ct. 1083, 1085, 47 L.Ed.2d 296 (1976); *Connor v. Johnson,* 402 U.S. at 692, 91 S.Ct. at 1762. Courts may use multimember districts only if "important and significant state considerations rationally mandate departure" from this principle. *Chapman,* 420 U.S. at 27, 95 S.Ct. at 766. This preference for single-member districts recognizes that "the practice of multimember districting can contribute to voter confusion, make legislative representatives more remote from their constituents, and tend to submerge electoral minorities and over-represent electoral majorities." *Connor v. Finch,* 431 U.S. at 415, 97 S.Ct. at 1834. *See also Chapman,* 420 U.S. at 15–16, 20, 95 S.Ct. at 760–61, 762–63 (expressing similar concerns).

While it is true that a court should defer to a state legislature's judgment that multi-member districts are appropriate, *Up-*

*ham,* 456 U.S. at 42–43, 102 S.Ct. at 1521–22; *Whitcomb v. Chavis,* 403 U.S. 124, 161, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), in this instance, there is no clear indication that the use of such districts is an established state policy. Indeed, the Georgia Constitution prohibits the use of multi-member districts in the state Senate. Art. III, § II, ¶ I(a) ("The Senate shall consist of not more than 56 Senators, each of whom shall be elected from single-member districts."). Additionally, while the 2001 reapportionment committee guidelines do not mention multi-member districts, the guidelines from the previous reapportionment explicitly prohibited the use of such districts, even in the state House. 1991 Guidelines, at § III(A)(4) ("All legislative and congressional districts shall be single-member districts."). The 1981 guidelines permitted the consideration of multimember districts, but subjected such proposals to close scrutiny and approved them only if they had neither the purpose nor the effect of diluting minority voting strength.

Second, the existing multi-member districts substantially contributed to the constitutional infirmity embodied in the House plan. As we indicated in our order striking down the House plan, several of the multi-member districts had discernible and intentionally constructed population deviations which appeared to us to have been drawn to protect or injure particular incumbents or improperly advance regional interests. We are convinced that maintaining *these* multi-member districts as a basis for a remedy would "validate the very maneuvers that were a major cause of the unconstitutional districting." *Abrams,* 521 U.S. at 79, 117 S.Ct. at 1930 (upholding the district court's plan, which made substantial changes to the existing plan, in

---

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981)(*en banc* ), the Eleventh Circuit adopted as binding precedent all decisions of

the former Fifth Circuit rendered prior to October 12, 1981.

part because deference was not owed to decisions made on unconstitutional bases, and in part because the remedy of constitutional defects in that case required substantial changes). Therefore, we direct the Special Master to adhere generally to the redistricting principle, traditionally followed by the Georgia General Assembly, of creating only single-member districts. While the existence of multi-member districts in the original plan might constitute a justification for maintaining such districts, the Special Master may only do so where the multi-member districts are not tainted by the factors which rendered the previous plans unconstitutional, and only so long as their inclusion does not undermine the other guidelines we have already enumerated. *See Abrams,* 521 U.S. at 79, 117 S.Ct. at 1930.

Accordingly, pursuant to the order entered on March 1, 2004, it is further ORDERED that Special Master Joseph Hatchett shall take notice of and abide by the above statements and conclusions of law in fashioning reapportionment plans for the State of Georgia.